NO.   95-317

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995


JOAN REEVES,

        Petitioner and Appellant,

    v

LIBERTY MUTUAL FIRE
INSURANCE COMPANY,

        Respondent and Insurer for

UNITED PARCEL SERVICE,

        Employer.


**FILED**

FEB 12 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:   The Workers Compensation Court of
               the State of Montana,
               The Honorable Mike McCarter, Judge presiding


COUNSEL OF RECORD:

        For Appellant:

            Michael P. Sand and Julianne C. Burkhardt,
            Sand Law Offices, Bozeman, Montana

        For Respondent:

            Larry W. Jones, Missoula, Montana


                        Submitted on Briefs:   November 16, 1995

                                   Decided: February 12, 1996

Filed:

_____
                Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Joan Reeves appeals a decision of the Workers' Compensation Court denying her request for rehabilitation benefits to permit her to pursue a master's degree in counseling. We affirm.

The sole issue raised is whether Reeves is eligible for a rehabilitation plan pursuant to § 39-71-2001, MCA (1993). Therefore we do not address the important issue discussed in the concurring opinion.

Joan Reeves injured her back in January 1994 while employed as a driver for United Parcel Service (UPS). After she reached maximum medical healing, she was restricted to work with medium physical demands, preventing her from returning to her job at UPS. She settled her workers' compensation claim for permanent partial disability in August 1994, specifically leaving open her claim for rehabilitation benefits pursuant to § 39-71-2001, MCA (1993).

Reeves subsequently proposed a rehabilitation plan to UPS's insurer, Liberty Mutual Fire Insurance Company, under which she would pursue a two-year program leading to a master's degree in counseling. Liberty Mutual rejected the proposal. Reeves then petitioned the Workers' Compensation Court for a hearing on whether she was entitled to rehabilitation benefits to pursue her plan.

The Workers' Compensation Court held a hearing on May 31, 1995, after which it denied Reeves' request for rehabilitation benefits. The court ruled that Reeves' proposed plan was not reasonable because she did not establish a reasonable expectation

that the plan would improve her position in the job market. Reeves appeals.

Is Reeves eligible for a rehabilitation plan pursuant to § 39-71-2001, MCA (1993)?

Section 39-71-2001(1), MCA (1993), provides:

Rehabilitation benefits. (1) An injured worker is eligible for rehabilitation benefits if:
(a) the injury results in permanent partial disability or permanent total disability as defined in 39-71-116;
(b) a physician certifies that the injured worker is physically unable to work at the job the worker held at the time of the injury;
(c) a rehabilitation plan completed by a rehabilitation provider and designated by the insurer certifies that the injured worker has reasonable vocational goals and a reemployment and wage potential with rehabilitation. The plan must take into consideration the worker's age, education, training, work history, residual physical capacities, and vocational interests.
(d) a rehabilitation plan between the injured worker and the insurer is filed with the department. If the plan calls for the expenditure of funds under 39-71-1004, the department shall authorize the department of social and rehabilitation services to use the funds.

We previously interpreted and applied this statute in State of Montana ex rel. Cobbs v. Montana Department of Social and Rehabilitation Services (Mont. 1995), ____ P.2d ____, 52 St.Rep. 1166 However, that case did not involve the issue here presented.

Liberty Mutual concedes that Reeves has met the requirements of subsections (1)(a) and (b) above. However, Liberty Mutual refused to participate in documenting Reeves' plan, instead merely assigning a rehabilitation counselor to offer her job placement assistance. Liberty Mutual did not designate Reeves' rehabilitation plan as a plan representing "reasonable vocational goals and

a reemployment and wage potential with rehabilitation," pursuant to subsection (1)(c), above. As a result, no plan was filed with the department pursuant to subsection (1)(d) above.

Reeves contends that Liberty Mutual admitted that she would earn $32,000 per year as a licensed practical counselor in private practice. This contention is based upon a proposed finding submitted to the Workers' Compensation Court by Liberty Mutual: "The Claimant plans, if she receives her master's degree, to work as a licensed practical counselor earning approximately $32,000.00 a year counseling clients in private practice."

Reeves' contention is without merit. A statement of an opposing party's plan does not equate to a statement of belief in the merits of the plan. The statement of Reeves' plan was not a concession that Reeves would actually earn the amount she planned to earn.

The Workers' Compensation Court heard evidence that, prior to her employment with UPS, Reeves earned a bachelor's degree in home economics with a family science option and that she held a long-term goal of obtaining a master's degree in counseling. Reeves had been working at UPS to save money to return to college to continue her schooling. She did not utilize her undergraduate degree to work in the field of social services for several reasons.

First, she could earn more money as a driver for UPS. Reeves' time-of-injury earnings with UPS were $12.82 per hour. Average wages for the social work/counseling field with a bachelor's degree were $9.62 per hour.

4

Second, Reeves did not wish to work with the type of clientele with whom she would have to work, with only an undergraduate degree. In her own words:

> THE COURT: [Your]degree is with the family services options and you are interested in family counseling. Why haven't you looked for jobs in the family services area?

> THE WITNESS: Because those jobs--the salaries for those jobs are--I guess basically that is not where I want to be. I've always wanted to be in family practice. There is a whole different clientele between entry-level jobs with my degree and the clientele that I would be working with as a counselor.

> Q. What I would like you to do, Joan, is maybe explain for the judge the difference in the type of work that you would do with the bachelor's degree that you presently hold as opposed to the type of work you would expect to do with a master's degree.

> A. Okay. Let's take an example that maybe I was like a social worker. I don't know that I could be an actual social worker, but something in that field.
> Basically, in my opinion, you would be dealing with kids, families who were in deep trouble, financial trouble, you know, possibly abuse situations, just some real sad case scenarios. That has just never been--you know, kids that probably are not being taken care of properly and that sort of thing.
> My clientele who I would like to work with are more just couples that are having problems, people that are coming to you who want to get well, who can get well, who have the--who are there because they want to solve the problem.
> A lot of these other jobs you can't help people. I mean they are in these situations by circumstance. They are, you know, due to poverty or some sort of situations, I mean in some ways beyond their control and, secondly, things that they don't want to change. I don't care to be involved in those situations.
> I choose to be involved in situations where I feel like I can more make a difference. You get kids and their parents are abusing them and that sort of thing, and you just have no control over that. Those are not situations that I care to be involved with.
> So marriage and family therapy, people come in who want to get well. They are real motivated to get well.

5

They are paying you for a service and, you know, they want to get well. That's who I want to work with. That's who I've always wanted to work with.

Q. Would the primary difference be the type of individual that you are working with?

A. Yes.

Reeves testified that at the time of the hearing she was earning $9.81 per hour as a telemarketer and ad salesperson for the Bozeman Daily Chronicle newspaper. She further testified that, once she earned her master's degree, she planned to be self-employed as a counselor. She stated that her father had offered to provide her with start-up costs of opening her own office.

Liberty Mutual concedes that Reeves' rehabilitation plan is reasonable inasmuch as she has the ability to do graduate college work. Susan Kern, the rehabilitation counselor to whom Liberty Mutual referred Reeves, testified by deposition that Reeves' vocational goal of obtaining a master's degree in counseling is reasonable for her to attain and that Reeves has the intellectual ability to complete the program. The Workers' Compensation Court noted "it's reasonable to expect that she's capable of completing the master's program and obtaining certification as a certified counselor."

However, the evidence as to other aspects of the reasonableness of Reeves' plan was less favorable. Reeves testified she intends to continue living in Bozeman, Montana. Kern testified that the Bozeman area is saturated with professional counselors.

Q. As a vocational counselor what is your independent impression for what this young lady should do?

6

A.   Well, I thought--I think she's somewhat unrealistic about her view of what therapy in the private sector is like.  I think, if that's truly her goal--and that's her personal choice, if she wants to pursue it or not--I think it's going to be very difficult to establish a practice in Bozeman.

In her deposition, Kern stated:

I think that Bozeman has a very competitive market, particularly in the self-employed, private counseling area.  There are 52 LPC's [licensed professional counselors] here.  That's not counting the people who have Master's in social work or clinical psychology.  So it's very competitive.  It would be very hard to start a business here unless you had a completely new or unusual background that was really in demand to people.

Other than the fact that she knows many people in Bozeman, Reeves presented no evidence of special experience or education that would set her off from her competitors in opening a counseling practice.

The Workers' Compensation Court reasoned that Reeves' own testimony proved that her expectations regarding employment as a private counselor were not reasonable and realistic. The court was not persuaded that, as a new counselor in the saturated counseling market of Bozeman, Montana, Reeves would be able to attract the kind of clientele to whom she wishes to limit her work.

The court concluded Reeves would be most likely to find counseling work with a social services agency.  Kern testified that her investigation revealed there was often no pay differential between persons with bachelor's and master's degrees in agency work in the Bozeman job market.  With a master's degree, the wage could rise to as much as $14.42 per hour, but for most positions in that market, entry-level wages were the same for a person with a master's degree as for one with a bachelor's degree.  At any rate,

7

Reeves does not wish to do agency work because it involves the type of clientele she wishes to avoid.

While § 39-71-2001, MCA (1993), encourages rehabilitation training for persons injured on the job, the statute does not obligate the insurer to pay for every rehabilitation plan which may be conceived by a qualified injured worker. If it did, subsection (1)(c) of the statute would have no purpose.

Section 39-71-2001, MCA (1993), must also be viewed in light of the purpose of the Workers' Compensation Act to return a worker to work as soon as possible after a work-related injury or disease. Section 39-71-105(2), MCA. That purpose would not be furthered by removing a worker from the work force for two years of "rehabilitation" which will not put the worker in a better position to obtain employment.

The decision of the Workers' Compensation Court was based upon an absence of a reasonable expectation that Reeves' rehabilitation plan would improve her position in the job market and on the unreasonableness of the career envisioned in Reeves' proposed rehabilitation plan as a means of employment, given her goals and self-imposed limitations. Reasonableness is a question of fact. Robertson v. Aero Power-Vat, Inc. (Mont. 1995), 899 P.2d 1078, 1080, 52 St. Rep. 673, 674. We review the Workers' Compensation Court's findings of fact to determine whether they are supported by substantial evidence. Stordalen v. Ricci's Food Farm (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. Substantial evidence in the record supports the Workers' Compensation Court's determination

8

that Reeves' proposed plan did not represent "reasonable vocational goals and a reemployment and wage potential with rehabilitation," as required under § 39-71-2001(1)(c), MCA (1993). We affirm the decision of the Workers' Compensation Court.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____
Justices

9

Justice James C. Nelson specially concurring.

I concur in the resolution of the issue raised on appeal, but believe that the threshold and dispositive issue was never presented to the Worker's Compensation Court and, therefore, is not addressed or resolved by this Court.

Reeves appeals from the decision of the Workers' Compensation Court denying her rehabilitation benefits under § 39-71-2001, MCA (1993). Basically, Reeves contends that she is entitled to rehabilitation benefits because, on the basis of the rehabilitation plan which she proposed, her vocational goal (to obtain a masters degree in counseling) is both reasonable and attainable and in accordance with her previous education, training, etc.

Liberty Mutual contends that Reeves' plan of obtaining a masters degree in counseling with the goal of counseling only a limited sort of clientele in Bozeman is not reasonable and has virtually no chance of success. Without going into detail, the Workers' Compensation Court appears to have adopted the view of Liberty Mutual--i.e., that Reeves' plan is neither reasonable nor attainable.

I suggest that because of the posture in which this case was presented to the Worker's Compensation Court by the parties, the court did not have the opportunity to rule on the threshold and dispositive legal problem here. Section 39-71-2001(1)(c), MCA (1993), provides that an injured worker is eligible for rehabilitation benefits if:

10

a rehabilitation plan completed by a rehabilitation provider and designated by the insurer certifies that the injured worker has reasonable vocational goals and a reemployment and wage potential with rehabilitation. The plan must take into consideration the worker's age, education, training, work history, residual physical capacities, and vocational interests.

Section 39-71-1011(4), MCA (1993), defines a "rehabilitation plan" as:

an individualized plan to assist a disabled worker in acquiring skills or aptitudes to return to work through job placement, on-the-job training, education, training, or specialized job modification.

That same section at (5) defines a "rehabilitation provider" as:

a rehabilitation counselor certified by the board for rehabilitation certification [defined in subsection (1)] and designated by the insurer to the department or a department of social and rehabilitation services counselor when a worker has been certified by the department of social and rehabilitation services under 39-71-1003.

I submit that the threshold problem in this case is that there never was a "rehabilitation plan" before the Workers' Compensation Court. That conclusion follows from the fact that no "rehabilitation provider" designated by the insurer ever formulated a "rehabilitation plan" while taking into consideration the requirements of the applicable statutes

To the contrary, Liberty Mutual simply hired Susan Kern, a rehabilitation counselor and, at the outset, instructed her that she was to assist Reeves with job placement but was not to assist her in preparation of a rehabilitation plan which included further education. In other words, Liberty Mutual, up front, simply dictated that there would be no rehabilitation plan formulated by the professional person whose job it was, under § 39-71-2001(1)(c),

11

MCA (1993), to come up with a plan. Rather, Liberty Mutual made the decision as to what rehabilitation benefits Reeves would be entitled to--i.e., job placement assistance only--and then directed the rehabilitation counselor to carry out that decision.

I suggest that implicit in § 39-71-2001, MCA (1993), in general, and in subsection (1)(c), in particular, is the obligation on the part of the insurer to, in good faith, designate a "rehabilitation provider" and then to let the "rehabilitation provider" formulate a "rehabilitation plan," taking into consideration the statutory criteria--the worker's age, education, training, work history, residual physical capacities, and vocational interests. See § 39-71-2001(1)(c), MCA. A plan developed in accordance with that statute may include "job placement, on-the-job training, education, training, or specialized job modification," or, presumably, any combination of those. See § 39-71-1011(4), MCA (1993).

The point is that it is the rehabilitation provider's job to formulate the rehabilitation plan, not the insurer's. See § 39-71-2001(1)(c), MCA (1993). If the insurer can simply dictate at the outset what the plan will or will not encompass and, coincidentally, what benefits will or will not be provided, then there is, obviously, no need for the services of a trained, experienced and certified rehabilitation provider, much less any input from the injured worker. Under those circumstances the entire statutory scheme is frustrated and the resultant "plan" is nothing less than a sham.

12

This interpretation is consistent with the purpose of the statute to provide rehabilitative benefits to injured workers. Moreover, I suggest that what the insurer cannot do is exactly what Liberty Mutual did in this case--i.e., refuse the claimant the opportunity for rehabilitative benefits consistent with a rehabilitation plan formulated by a rehabilitation provider in accordance with the statutory criteria and on the basis of the counselor's professional knowledge, training and experience, and work with the claimant. That is the threshold problem here as regards Liberty Mutual.

On the part of Reeves, the statute clearly does not authorize her to come up with her own rehabilitation plan as she is not a rehabilitation provider under the statute nor has she been designated in that capacity by the insurer (assuming that she had the professional qualifications in the first place). Moreover, simply because the claimant comes up with a plan of how *she wants* to be rehabilitated, that does not obligate the insurer to agree with her plan nor does it obligate the department or the court to approve it.

Here, whether *Reeves' plan* was unrealistic and unworkable, given the market and the type of practice she wanted to establish was not the issue. Rather, in my view, the court was put into the position of having to simply assume that the claimant's plan was the statutory "rehabilitation plan." I suggest that there was, in fact, no rehabilitation plan before the court as the statutory requirements for formulating such a plan had not been even

13

minimally followed by Liberty Mutual. Furthermore, Reeves had no statutory authority to come up with her own plan.

If the parties were required to follow the statutory scheme, Liberty Mutual would be obligated to designate a "rehabilitation provider" as defined in § 39-71-1011(5), MCA (1993), and then allow the rehabilitation provider to independently work with the claimant and develop a rehabilitation plan for presentation to the insurer. Section 39-71-2001(1)(c) and (d), MCA (1993). Assuming that the rehabilitation provider and the plan certified that the injured worker had reasonable vocational goals and reemployment and wage potential with rehabilitation and that the plan is designed to accomplish those, taking into consideration the requirements of § 39-71-2001(1) (c), MCA (1993), then it **seems** to me, that at a minimum, the statutory framework has been honored.

Under § 39-71-2001(1)(d), MCA (1993), if the injured worker and the insurer agree with the rehabilitation plan, then the plan is filed with the department of labor and benefits are provided in accordance with the plan. If either the insurer or the claimant disagree with the rehabilitation plan, the insurer **or claimant** then has an avenue of review through mediation, the Workers' Compensation Court and, ultimately, this Court.

This interpretation of the statutory framework is consistent with our recent decision in State ex rel. Cobbs v. Montana Department of Social and Rehabilitation Services (Mont. 1995), 52 St.Rep. 1166, 1169, wherein we noted that the rehabilitation plan under § 39-71-2001, MCA (1993), is "developed by the insurer,

14

claimant and rehabilitation provider and filed with the **Department** of Labor." We also stated that "[e]ntitlement to rehabilitation benefits sought pursuant to § 39-7-2001, MCA (1993), is determined by the worker, the insurer, the private 'rehabilitation provider,' the Department of Labor and, in the event of a dispute, the workers' compensation mediator and the Workers' Compensation Court." Cobbs, 52 St.Rep. at 1169.

In the instant case, had the statutory framework been followed, a rehabilitation plan might have been developed with and for Reeves that would have satisfied both the insurer and the claimant, or if not both, at least the court, on review. As it is, the statutes were ignored and Reeves has been denied rehabilitation benefits altogether. A no less satisfactory consequence of this case is that our opinion (which is only the second interpreting this section of the code), seemingly approves of the procedures used here--procedures that do not even minimally comport with the statutory scheme enacted by the legislature.

_____
Justice

Justice Karla M. Gray concurs in the foregoing special concurrence.

_____
Justice

15

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

By affirming the Workers' Compensation Court, the majority has placed an impossible burden on injured workers who wish to restore some of their lost earning capacity by availing themselves of the rehabilitation benefits provided for in the Workers' Compensation Act.

Joan Reeves proved that her earning capacity had been substantially reduced due to a job-related disability; her earning capacity could be substantially improved by furthering her education; and she was qualified by intellect, training, and disposition for the program in which she sought to enroll. These facts are uncontroverted and are sufficient to satisfy the requirements of § 39-71-2001, MCA (1993).

Instead of applying the simple terms of the rehabilitation statute, the Workers' Compensation Court, and the majority of this Court, have required that before completing a two-year graduate program, the claimant know exactly what kind of counseling she is going to do, what kind of market there is for that counseling, and how she would overcome professional obstacles that she is not even in a position to anticipate. What the court has done is no different than concluding that it is unreasonable for someone to enter law school unless they first know what their specialized area of practice is going to be, how many other people are currently engaged in that specialized area, and what their marketing strategy is going to be for competing with already established lawyers.

16

Most lawyers would agree that applying these same requirements to their own profession would be absurd. Applying these requirements to Joan Reeves is no less absurd.

The uncontroverted evidence established the following:

Joan Reeves has a bachelor's degree in home economics with a family science option. The family science option was recommended for students intending to obtain a master's degree in family counseling. She satisfied the requirements for a family science option because it was always her intention to obtain a master's degree and become a family counselor.

Joan maintained a "B" average in high school and a "B+" average in college. Everyone concedes that she is academically and intellectually qualified to enter and successfully complete a master's degree program which would qualify her to become a licensed practical counselor providing marriage and family therapy.

After her graduation from MSU in June 1991, before entering a master's program, she first went to work to pay off debts that she had accumulated during college and to save money for her graduate education. At the time, entry level jobs for which she would have qualified with her college degree paid from $7.00 to $8.00 per hour. However, by doing physical labor for her father she was able to earn $10.00 an hour. She later earned $11.00 an hour as her starting wage for UPS. At the time of her injury she was earning $12.82 an hour as a package car driver. Evidence at the trial was that after two years on the job her wage would have increased to $18.84 an hour.

17

On January 4, 1994, while working for UPS, Joan sustained a back injury. As a result of her injury she cannot **return** to her job. She has been unable to find employment related to her education and instead does telemarketing and other part-time work for the Bozeman Chronicle. Her average hourly wage, including commissions, is $9.81 an hour.

She explained that her interest in obtaining a master's degree was based on two factors. First, she stated that she could not otherwise qualify for the specific type of counseling that she was interested in. Second, she testified that counselors with a master's degree earn substantially more than counselors with a bachelor's degree.

Reeves was not, as the Workers' Compensation Court found, unrealistically selective about the kind of work she wanted to do as a counselor. Following cross-examination by the Workers' Compensation Court Judge, she tried to provide the following explanation for preferring private practice to agency work:

> THE COURT: I understand the kind of people that you want to counsel; but, in my mind immediately is are those the kind of people who are going to be coming to marriage counselors?

> THE WITNESS: You made a comment earlier that, you know, that I assumed that there were just going to be husbands and wives without kids and stuff. I just wanted to clear that up. I mean I assume that husbands and wives are going to come in with kids who probably have drug problems or are acting out and those sort of things. I realize there are other types of situations.

> My clarification is that I think the difference being those people are coming to you for help. I mean they are not people who have been assigned to you by

someone else.  I mean those are people [who] actually want help.

In other words, Reeves' innocent statement which has been blown out of proportion by the Workers' Compensation Court was that given her choice she would rather counsel people in the private sector who are interested in solving their problems than people assigned to her at a government agency who are there simply because they have to comply with some court or agency directive.

The idea that this person who has not even enrolled in her master's degree program should somehow be able to anticipate exactly who her clientele will be or how she will adapt her education to the realities of the market place is strange to begin with.  Nevertheless, doing her best to respond to the trial judge's concerns, she later explained during re-examination that in a worst case scenario if she could not successfully establish a private practice, but had a master's degree, she could go to work for an agency earning more than she would earn with a bachelor's degree and still eventually attempt to work into a private practice.

The testimony of Susan Kern, the rehabilitation counselor hired by Liberty Mutual, did nothing to dispel the obvious conclusion that Reeves' vocational rehabilitation proposal was reasonable.

Kern agreed that Reeves' earning capacity, without further education, was between $7.00 and $10.73 per hour, but that with a master's degree her entry level wage for a mental health agency would be $12.30 per hour.

19

Kern agreed that Reeves was intellectually capable of completing the master's program. She agreed that with some employers she would have a greater long-term earning capability with a master's degree than with a bachelor's degree, and she agreed that there were differences in the job descriptions for people with bachelor's degrees, as opposed to master's degrees. Most critically, Kern, who was retained and paid for by Liberty Mutual, gave the following testimony:

Q. I asked you in your deposition a question about whether you had enough information about Joan to form an opinion as to whether you thought her vocational goal of getting a master's degree was a reasonable goal for her. What is your opinion in that regard?

A. I think it's reasonable for her.

Section 39-71-2001, MCA (1993), does not require the impossible. It simply requires that before a claimant qualifies for rehabilitation benefits he or she have a partial disability, be unable to return to the job at which the claimant was injured, and have a rehabilitation plan, including "reasonable vocational goals." All of those requirements were satisfied in this case. To deny Reeves benefits because prior to even entering the graduate program she was not absolutely certain about the kind of clientele she would counsel, the feasibility of the type of counseling she thought she would prefer, or the marketing strategy she would employ to be successful, suggests a preoccupation on the part of the trial court with denial of claimant's benefits, rather than an objective application of the statutory requirement.

20

Although the concurring opinion certainly does not have the force of precedent, I am also concerned about some of the views stated therein. I agree that pursuant to the requirements of § 39-71-2001, MCA (1993), the insurer has no right to dictate to the rehabilitation provider what plan is most suitable for a claimant. I also agree that the insurer has an obligation to act in good faith when it selects and designates the rehabilitation provider and when it charges the provider with its responsibility.

However, to assume, as the concurring opinion does, that insurers will not exert total and complete control, even if indirectly, over the rehabilitation providers which it retains at its expense, ignores reality.

Under the current statutory scheme there is little opportunity for, and no funding with which injured workers can consistently retain rehabilitation providers. Insurers and employers are the only parties who can consistently hire them. Any private rehabilitation provider currently operating in this state knows that it cannot long do business without a satisfied clientele of insurers. Therefore, if the only plans the Workers' Compensation Court can consider are those submitted by the rehabilitation counselor hired by the insurer, no claimant will ever qualify for rehabilitation benefits and the statutory framework which encourages rehabilitation in exchange for a reduction in partial disability benefits would be rendered meaningless. If this Court is going to apply § 39-71-2001, MCA (1993), as narrowly as suggested by the concurring opinion, it might as well interpret the

21

statute to mean "an injured worker is eligible for rehabilitation benefits if his or her insurer decides that it would like to pay an extra 104 weeks of benefits."

I would conclude that whenever an insurer, or the rehabilitation provider that it hires and pays for, arbitrarily and unreasonably refuses to consider rehabilitation for an injured worker, that worker must necessarily have the option of submitting his or her own rehabilitation plan to the Workers' Compensation court for consideration of whether it meets the statutory requirements of § 39-71-2001, MCA (1993). To hold otherwise would give the insurer complete and total control over the eligibility of injured workers for rehabilitation benefits.

Having made this observation, however, I would note that this issue was not before the Workers' Compensation Court and is not before this Court because even the insurer concedes in its appellate brief that under the circumstances it would be unreasonable to argue that the court should not have considered claimant's proposed rehabilitation plan. At page 18 of its brief the insurer states:

> Additionally, Liberty does not claim rehabilitation benefits are inappropriate because no plan has been filed with the Department. It would be unreasonable for a carrier to defend on this basis when the lack of a rehabilitation plan results from the insurer having instructed the rehabilitation provider to perform an employability assessment and then, after the assessment reveals the claimant can return to work without retraining, authorizes only job placement services.

Joan Reeves proposed the most reasonable rehabilitation plan possible considering her age, education, training, work history,

22

physical limitations, and vocational interests. It was wrong to frustrate her sincere and legitimate efforts to improve her vocational future based on the unreasonable and impossible demands of the trial court.

For these reasons I dissent from the majority opinion and disagree in part with the concurring opinion.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

_____
Justice

23

Justice W. William Leaphart, dissenting.

I dissent. In my opinion, Reeves' plan of obtaining a Master's Degree in counseling was both reasonable and attainable. Although the Court had concerns about the prospects of her success at counseling in the private sector, the record indicates that Reeves would still have the option of seeking employment as a counselor with a governmental agency. With a Master's Degree, Reeves will, either in the public or private sector, demand a higher salary than with her Bachelor's Degree.

_____
Justice

24